UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT TAYLOR, Mayor, City of Roseville;
DOUGLAS R. ALEXANDER, City Manager, City of
Algonac;  MATTHEW BIERLEIN, County
Commissioner, Tuscola County;  DONALD LYONS,
Mayor, City of Dowagiac; TODD R. ROBINSON,
Superintendent, New Haven Community Schools;
RUSSELL PICKELL, Superintendent, Riverview
Community Schools;  GARY O'BRIEN, School Board
President, Riverview Community Schools;   KELLY
COFFIN, Superintendent, Tecumseh Public Schools;
KIMBERLY AMSTUTZ-WILD, School Board President,
Tecumseh Public  Schools; KEITH WUNDERLICH,
Superintendent, Waterford School District;  ROBERT
SEETERLIN, School Board President, Waterford School
District;  MICHELLE IMBRUNONE, Superintendent,
Goodrich Area Schools;  DAVID P. PRAY,
Superintendent, Clinton Community Schools; PATRICIA
MURPHY-ALDERMAN, Superintendent, Byron Area
Schools;  AMY LAWRENCE, School Board President,
Byron Area Schools; ROBERT D. LIVERNOIS,
Superintendent, Warren Consolidated School District;
YVONNE CAAMAL CANUL, Superintendent, Lansing
School District, *in their individual and official capacities*;
and STEPHEN PURCHASE, *in his individual capacity.*

                    Plaintiffs,
v.


RUTH JOHNSON, in her official capacity as  Secretary of
the State of Michigan; and the STATE OF MICHIGAN,

                    Defendants.

No. 2:16-cv-10256

HON. JOHN CORBETT O'MEARA

MAG. R. STEVEN WHALEN

**FOUNDATION FOR
MICHIGAN FREEDOM'S
AMICUS CURIAE BRIEF IN
OPPOSITION TO
PLAINTIFFS' *EX-PARTE*
MOTION FOR A
TEMPORARY
RESTRAINING ORDER AND
A PRELIMINARY
INJUNCTION**

_____/

Scott R. Eldridge (P66452)
Michael J. Hodge (P25146)
Attorneys for Plaintiffs
One Michigan Avenue
Lansing, Michigan  48933

Jerome  R.  Watson  (P27082)
Brian M. Schwartz (P69018)
Attorneys for Plaintiffs
150 West Jefferson, Ste. 2500
Detroit, Michigan  48226
313.963.6420

Denise C. Barton (P41535)
Joseph Y. Ho (P77390)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

_____/

**FOUNDATION FOR MICHIGAN FREEDOM'S
AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' *EX-PARTE* MOTION
FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

CONCISE STATEMENT OF ISSUES PRESENTED.................................................. iv

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..................................... v

IDENTITY AND INTEREST OF *AMICUS* ............................................................. vi

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 2

ARGUMENT ............................................................................................................... 8

    I.  Requirements to obtain injunctive relief ......................................................... 8

    II.  Plaintiffs have failed to demonstrate any likelihood of success on the merits...................... 9

        A.  A public body or a person acting for a public body does not possess First Amendment Rights ...................................................................................... 9

        B.  The Fourteenth Amendment of the United States Constitution protects citizens, not a public body or a person acting for a public body.................... 10

        C.  The State of Michigan may determine how its own subdivisions expend public resources ............................................................................................. 11

    III.  Using private resources, the Plaintiffs are not restricted -- in any manner whatsoever – by Section 57(3)...................................................................... 13

    IV.  The substantial harm to others if the injunction should be issued ..................... 13

    V.  The public interest favors the ability of the State of Michigan to determine how the State of Michigan's own subdivisions expend public resources and how to preserve the purity of elections .................................................................... 14

CONCLUSION AND RELIEF REQUESTED ........................................................... 16

CERTIFICATE OF SERVICE................................................................................... 16

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aldrich v. Knab*, 858 F. Supp. 1480, 1491 (W.D. Wash. 1994) ................................... 10

*Business Executives' Move for Vietnam Peace v. FCC*, 450 F.2d 642, 646 (1971) ...................... 9

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) .................................................................................................... 8

*Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94 (1973)  9, 10, 12

*Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972) ....................................................................................... 8

*Entertainment Productions, Inc. v. Shelby County, Tennessee*, 721 F.3d 729 (6th Cir. 2013) .... 14

*Imaginary Images, Inc. v. Evans,* 612 F.3d 736, 749 (4th Cir.2010) ............................................ 14

*Kelley v. Metropolitan Bd. of Educ. of Nashville and Davidson Cty. Tenn.*, 836 F.2d 986, 996 (6th Cir.1987), cert. denied, 487 U.S. 1206 (1988) .................................................... 15

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) .......................................................... 8

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ........................................................... 8

*McCray v. United States* 195 U.S. 27 (1904) .............................................................. 14

*Mosier v. Wayne County Bd of Auditors*, 295 Mich. 27, 31; 294 NW 85 (1940) ........................ 12

*Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1038 (5th Cir. 1982) .................... 10

*NAACP v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990) ............................................... 10

*Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). 8

*Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) ................................................ 13

*Reynolds v. Sims*, 377 U.S. 533, 575 (1964) .............................................................. 11

*Serra v. U.S. Gen. Servs. Admin.*, 847 F.2d 1045, 1048 (2d Cir. 1988) ....................................... 10

*Sons of Confederate Veterans, Inc. v. Holcomb*, 129 F. Supp. 2d 941, 944-45 (W.D. Va. 2001) 10

*Student Government Ass'n v. Board of Trustees of the Univ. of Mass.*, 868 F.2d 473, 481 (1st Cir. 1989) .................................................................................................... 10

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) ....................................................... 8

*Warner Cable Comm. v. City of Niceville*, 911 F.2d 634, 638 (11th Cir. 1990) ......................... 10

*Wooley v. Maynard*, 430 U.S. 705 (1977) ..................................................................................... 12

**Statutes**

MCL 169.206(2)(j) ............................................................................................................................. 6

MCL 169.211(7) ................................................................................................................................ 7

MCL 169.257(1) ................................................................................................................................ 6

MCL 169.257(3) ....................................................................................................................... passim

Public Act 31 of 2012 .................................................................................................................. v, 2

**Other Authorities**

OAG, 1965-1966, No. 4291, p. 1 (January 4, 1965) ...................................................................... 11

OAG, 1979-1980, No. 5597, p. 482 (November 28, 1979) ........................................................... 11

OAG, 1987-1988, No. 6423, pp. 33, 35 (February 24, 1987) ....................................................... 11

OAG, 1991-1992, No. 6709, p. 124 (February 11, 1992) ............................................................. 12

OAG, 1991-1992, No. 6710, pp. 125, 127 (February 13, 1992) ................................................... 11

OAG, 1993-1994, No 6785, p 102 (February 1, 1994) ................................................................. 12

OAG, 1993-1994, No. 6763, p. 45 (August 4, 1993) .................................................................... 12

OAG, 2005-2006, No. 7187, p. 81 (February 16, 2006) ................................................................. 2

**Rules**

Fed. R. Civ. P. 65 .............................................................................................................................. 8

**Constitutional Provisions**

Const. 1963, art. 7 and art. 8 ......................................................................................................... 11

Fourteenth Amendment ................................................................................................................. 10

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

I.  Whether a subdivision of the State of Michigan, or a person acting for a subdivision of the State of Michigan, may challenge a policy decision of the State of Michigan pursuant to the Michigan Constitution as to how the State of Michigan's own subdivisions expend public resources or how the State of Michigan preserves the purity of elections?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Michigan Const. 1963 art. 2 § 4, art. 7, art. 8

Public Act 31 of 2012 (enacting Section 1)

MCL 169.257

*Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 139 (1973) (Stewart, J. concurring)

*Reynolds v. Sims*, 377 U.S. 533 (1964)

*Kelley v. Metropolitan Bd. of Educ. of Nashville and Davidson Cty. Tenn.*, 836 F.2d 986, 996 (6th Cir.1987), cert. denied, 487 U.S. 1206 (1988)

## IDENTITY AND INTEREST OF *AMICUS*

The Foundation for Michigan Freedom (the "Foundation") respectfully requests leave from this Court to appear as *amicus curiae*, asking this Court to protect the integrity of the ability of the State of Michigan to determine how its own subdivisions expend public resources and to preserve the purity of elections.

The Foundation is a nonprofit, nonpartisan organization recognized by the Internal Revenue Service as tax-exempt pursuant to Section 501(c)(3) of the Internal Revenue Code. A core mission of the Foundation is to undertake legal research projects in the public interest and to provide legal support in litigation designed to present positions on behalf of the public at-large on matters of public interest. In particular, the Foundation's core missions include nonpartisan research and analysis concerning fiscal responsibility.

The Foundation comes to this Court not as a public body, or any person acting for a public body. The Foundation is not seeking to promote or defeat any bond, millage, or other local ballot question. Instead, the Foundation comes to this Court from a citizen's perspective, seeking to protect the ability of the People's representatives to determine how to expend public resources and to preserve the purity of elections.

## <u>INTRODUCTION</u>

This is not a First Amendment case. Although the Plaintiffs claim that this is a First Amendment case, the Plaintiffs have failed to cite <u>any</u> case that affords a public body, or a person acting for a public body, with First Amendment protection. Similarly, although the Plaintiffs have filed suit against the State of Michigan under the Fourteenth Amendment of the United States Constitution, the Plaintiffs have completely ignored that the Fourteenth Amendment offers protections to citizens, not to a public body or a person acting for a public body.

As a result of these glaring omissions of constitutional jurisprudence, the Plaintiffs attempt to characterize this matter as a First Amendment case; however, using private resources, the Plaintiffs are not restricted--in any manner whatsoever--by Section 57(3) of the Michigan Campaign Finance Act (the statute at issue here).   What the Plaintiffs seek is for this Court to recognize a right that no other court has ever recognized:  The absolute right of a public body, or a person acting for a public body, to use public resources to engage in political activity. Because such a "right" does not exist, this case is nothing more than an attempt to persuade this Court to substitute its judgment for the judgment of the State of Michigan as to how the State of Michigan's own subdivisions expend public resources.

1

## <u>STATEMENT OF FACTS</u>

**I. The Relevant History of Section 57 of the Michigan Campaign Finance Act.**

According to Article II, Section 4 of the Michigan Constitution:

> "Sec. 4.  The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States.  The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.  No law shall be enacted which permits a candidate in any partisan primary or partisan election to have a ballot designation except when required for identification of candidates for the same office who have the same or similar surnames."

As recognized by the Michigan Attorney General:

> "It is my opinion, therefore, that section 57 of the Michigan Campaign Finance Act, MCL 169.257: (a) is a valid exercise of legislative authority to regulate the use of public resources and to "preserve the purity of elections" under Const 1963, art 2, § 4;"

OAG, 2005-2006, No. 7187, p. 81 (February 16, 2006).

In Public Act 31 of 2012, the Michigan Legislature codified the policy behind Section 57 of the Michigan Campaign Finance Act in the clearest terms possible:

> "Enacting section 1. It is the policy of this state that a public body shall maintain strict neutrality in each election and that a public body or a person acting on behalf of a public body shall not attempt to influence the outcome of an election held in the state. If there is a perceived ambiguity in the interpretation of section 57, that section shall be construed to best effectuate the policy of strict neutrality by a public body in an election."

Accordingly, pursuant to the Michigan Legislature's authority to "preserve the purity of elections" under the Michigan Constitution, the express policy underlying Section 57 of the Michigan Campaign Finance Act is that a "public body shall not attempt to influence the outcome of an election held in the state."

2

## II.  The Myth of "Objectively Neutral Information".

As explained later in this Brief, the policy decision of the Michigan Legislature -- how to best maintain the purity of elections and how the State of Michigan determines how the State of Michigan's own subdivisions expend public resources -- is not a question properly before this Court. Nonetheless, the Plaintiffs here have repeatedly stated that the nature of the information that they wish to disseminate using public resources is merely "objectively neutral information." (*See, for example,* R.1, Complaint, Pg ID 2, 3, 5, 8-22, 24-28).

Again, while not relevant to whether the Plaintiffs have a cognizable right to use public resources to engage in political activity, the following are just a few examples of this so-called "objectively neutral information":

1.  https://www.bloomfield.org/board-of-education/millage-renewal

    "As required by law, voters must approve a renewal of the Hold Harmless Millage every 10 years. There will be no change in the way taxes are calculated or collected."

2.  http://www.farmington.k12.mi.us/millage2015/

    VIDEO [0:42] "We have an area on our website that you can click on to get further information. We look forward to your support."

    https://www.farmington.k12.mi.us/millage2015/pdf/millage_faqs.pdf

    "The renewal will ensure the continuation of Farmington Public Schools' excellent educational program.



*Vote with Green check mark.

3. http://www.troy.k12.mi.us/apps/pages/index.jsp?type=d&uREC_ID=363152&pREC_ID
=837246
https://d3jc3ahdjad7x7.cloudfront.net/UQG1VERqH9ITbEUb5tmZBWMRVM4J1rWVy
iRI1TQkcwCB3UIF.pdf

"This proposal is critically important to our schools and our community."

4. http://www.fhgov.com/Government/Current-Programs-Initiatives/Public-Safety-Millage-
Brochure.aspx

"Maintain Excellence in Public Safety"
"Maintain Pride in Our Community"
"Maintain Staffing Levels in the City's Award-Winning Public Safety Team"
"Maintain the High Quality of Life in Farmington Hills"

5. https://dearbornschools.org/news/359-hold-harmless-renewal-will-keep-dearborn-public-
schools-programs-in-place

HEADLINE: "Hold Harmless Renewal Will Keep Dearborn Public Schools Programs In
Place"

"The Dearborn Public Schools will ask voters to renew the Hold Harmless millage on the
November ballot."

"The Hold Harmless RENEWAL will keep the positive momentum and success moving
forward."

6. http://www.howelllibrary.org/library_millage_proposal_vote_august_6.htm

"Library Millage Proposal - Vote August 6!

*For an additional 58 cents per week (based on average home value), YOU can save our library for years to come!"

7. http://www.mattawanschools.org/cms/lib011/MI01000487/Centricity/Domain/566/VoteNov4-Tri%20Fold%20Brochure.pdf

"These students are the future of our community. Let's make sure they have the right educational tools."

8. https://www.bedford.k12.mi.us/technology.html

"The renewal of the Technology Millage is critical to the continued success of our Bedford students.

MAKE A NOTE & VOTE!
Look for more information to come and remember to vote on May 3, 2016!"

Significantly, even the Moody's Investors Service article relied upon by the Plaintiffs is entitled: "Michigan Campaign Finance Reform Curtails Local Governments' Ability to Promote Property Tax Measures" (R. 1-4 Pg ID 122). This article indicates that local governments use public funds to "promote" a local ballot question and that Section 57(3) of the Michigan Campaign Finance Act will "curtail their promotional abilities regarding the tax before each vote." *Id*. As this article admits, this so-called "objectively neutral information" promotes a local ballot question.

Accordingly, to the extent relevant here, it is demonstrably untrue and patently false for the Plaintiffs to represent to this Court that Section 57(3) of the Michigan Campaign Finance Act unfairly prevents "objectively neutral information." The term "objectively neutral information" completely mischaracterizes the true purpose of this information to influence elections.

### III.  The Need for Section 57(3) of the Michigan Campaign Finance Act.

Because the dissemination of so-called "objectively neutral information" violates the "policy of strict neutrality by a public body in an election," Section 57(3) of the Michigan

5

Campaign Finance Act, MCL 169.257(3) (hereinafter referred to as "Section 57(3)) became necessary. Prior to Section 57(3), public bodies were able to evade the application of the Michigan Campaign Finance Act and violate the "policy of strict neutrality by a public body in an election" by merely avoiding the use of the words of "express advocacy" in their so-called "objectively neutral information." In this regard, before Section 57(3), <u>none</u> of the examples referenced on pages 3-5 of this Brief would have violated Section 57 of the Michigan Campaign Finance Act, because Section 57(1) only applies to "expenditures". *See* MCL 169.257(1). Significantly, absent the use of "express advocacy" words, a communication is exempt from the definition of "expenditure" under the Michigan Campaign Finance Act:

> "(j) Except only for the purposes of section 47, an expenditure for a communication if the communication does not in express terms advocate the election or defeat of a clearly identified candidate so as to restrict the application of this act to communications containing express words of advocacy of election or defeat, such as "vote for", "elect", "support", "cast your ballot for", "Smith for governor", "vote against", "defeat", or "reject"."

MCL 169.206(2)(j).

Consequently, in order to close this "express advocacy" loophole that allowed a public body to violate the "policy of strict neutrality by a public body in an election," Section 57(3) became necessary. As the text of Section 57(3) illustrates, Section 57(3) is a positive step to maintain the "policy of strict neutrality by a public body in an election":

> "(3) Except for an election official in the performance of his or her duties under the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992, a public body, or a person acting for a public body, shall not, during the period 60 days before an election in which a local ballot question appears on a ballot, use public funds or resources for a communication by means of radio, television, mass mailing, or prerecorded telephone message if that communication references a local ballot question and is targeted to the relevant electorate where the local ballot question appears on the ballot."

MCL 169.257(3).

6

By its own terms, Section 57(3) only applies to a "public body, or a person acting for a public body" using "public funds or resources."  Under the Michigan Campaign Finance Act, the term "public body" only applies to the State of Michigan and its subdivisions.  MCL 169.211(7).  The Plaintiffs, in either their individual capacity or using private resources, are not affected, in any manner, by Section 57(3).  Stated differently, Section 57(3) only applies to the internal operations of the State of Michigan and its subdivisions. Again, Section 57(3) represents a policy determination of the Michigan Legislature to preserve the purity of elections and a determination by the State of Michigan as to how the State of Michigan's own subdivisions shall expend public resources.

## ARGUMENT

### I. Requirements to obtain injunctive relief.

Fed. R. Civ. P. 65 authorizes the issuance of temporary restraining orders and preliminary injunctions. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction [sic]." *Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972) (internal quotation omitted). A preliminary injunction "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).

When considering a motion for preliminary injunction, a district court must balance four factors: (1) whether the plaintiff has a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citing *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).

## II.  Plaintiffs have failed to demonstrate any likelihood of success on the merits.

### A.  A public body or a person acting for a public body does not possess First Amendment Rights.

The Plaintiffs have argued to this Court that this matter is a First Amendment case. In fact, the Plaintiffs cite 28 cases in their brief in support of this claim. (R.3, Brief in Support Pg ID 136-137). However, <u>none</u> of these 28 cases offered by the Plaintiffs recognize the First Amendment right of a public body, or a person acting for a public body, to use public resources to disseminate so-called "objectively neutral information" in an effort to influence an election. The reason for the Plaintiffs' inability to provide such authority to this Court is straight-forward: No court has ever recognized the First Amendment right of a public body, or a person acting for a public body, to use public resources to engage in political activity.

Fatal to the Plaintiffs' First Amendment claims here are those cases which have addressed this particular issue, because these cases illustrate the categorical denial of First Amendment protection for government speech. The principle that government entities cannot claim the protection of the First Amendment found its first judicial expression in Justice Stewart's concurrence in *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94 (1973), in which the United States Supreme Court reversed a D.C. Circuit opinion holding that the First Amendment required broadcasters to take advertisements from all who sought to place them. *Id.* at 139-142 (reversing *Business Executives' Move for Vietnam Peace v. FCC*, 450 F.2d 642, 646 (1971)). Justice Stewart emphasized the United States Supreme Court's rejection of the appellate panel's suggestion that the broadcaster's receipt of public funding meant that it was effectively acting as a part of the government. However, if these broadcasters were government entities, Justice Stewart explained that they could not exercise constitutionally protected editorial

9

discretion because the Speech Clause would be inapplicable to them. 412 U.S. at 139 (Stewart, J., concurring). Accordingly:

> "The First Amendment protects the *press* from governmental interference; it confers no analogous protection *on* the Government." *Id.* (emphasis in original)

Consequently, courts have uniformly held that a government speaker is not protected by the First Amendment. *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1038 (5th Cir. 1982) (en banc) (noting that "[g]overnment expression" is "unprotected by the First Amendment"); *Serra v. U.S. Gen. Servs. Admin.*, 847 F.2d 1045, 1048 (2d Cir. 1988); *NAACP v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990); *Student Government Ass'n v. Board of Trustees of the Univ. of Mass.*, 868 F.2d 473, 481 (1st Cir. 1989); *Warner Cable Comm. v. City of Niceville*, 911 F.2d 634, 638 (11th Cir. 1990); *Aldrich v. Knab*, 858 F. Supp. 1480, 1491 (W.D. Wash. 1994). *Sons of Confederate Veterans, Inc. v. Holcomb*, 129 F. Supp. 2d 941, 944-45 (W.D. Va. 2001).

Accordingly, fatal to the Plaintiffs' claims here, a public body, or a person acting for a public body, has no First Amendment protection.

### B. The Fourteenth Amendment of the United States Constitution protects citizens, not a public body or a person acting for a public body.

Because the State of Michigan is the Defendant in this case, the Plaintiffs must necessarily invoke the Fourteenth Amendment to the United States Constitution. (R.1, Complaint Pg ID 24, 26). In this regard, Section 1 of the Fourteenth Amendment provides:

> "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

10

However, Section 57(3) does not apply to "citizens" using private resources. Moreover, the Plaintiffs herein are not before this Court as "citizens" but as "persons acting for a public body." A public body, or a person acting for a public body, may not invoke the Fourteenth Amendment to the United States Constitution. Therefore, for this reason alone, the Plaintiffs' First Amendment claims have no merit.

### C.  The State of Michigan may determine how its own subdivisions expend public resources.

According to the United States Supreme Court:

> "Political subdivisions of States -- counties, cities or whatever -- never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of State governmental functions." *Reynolds v. Sims*, 377 U.S. 533, 575 (1964).

Consistent with the foregoing, the Michigan Constitution makes it abundantly clear that counties, cities, townships, schools, and other local units of government are subdivisions of the State of Michigan, subject to the control of the Michigan Legislature. *See, for example,* Const. 1963, art. 7 and art. 8.

In accordance with this absolute control, absent express legislative authority, a public body cannot use public resources to influence the electorate to support or oppose a particular candidate or ballot proposal. *See, for example,* OAG, 1965-1966, No. 4291, p. 1 (January 4, 1965) (school district could not spend public funds to advocate a favorable vote on a tax and bond ballot proposal); OAG, 1979-1980, No. 5597, p. 482 (November 28, 1979) (State Civil Rights Commission could not use public funds "to urge the electorate to support or oppose a particular candidate or ballot proposal"); OAG, 1987-1988, No. 6423, pp. 33, 35 (February 24, 1987); OAG, 1991-1992, No. 6710, pp. 125, 127 (February 13, 1992); OAG, 1993-1994, No. 6763, p. 45

11

(August 4, 1993) ("School districts may not permit their offices and phone equipment to be used in a restrictive manner for advocacy of one side of a ballot issue .... School districts may not endorse a particular candidate or ballot proposal"); OAG, 1993-1994, No 6785, p 102 (February 1, 1994). See also, OAG, 1991-1992, No. 6709, p. 124 (February 11, 1992) (state agency cannot use public funds to lobby unless authorized by law to do so), and *Mosier v. Wayne County Bd of Auditors*, 295 Mich. 27, 31; 294 NW 85 (1940) (addressing county board's lack of authority to expend county resources for political purpose).

Based on the foregoing, Section 57(3) represents the State of Michigan's decision as to how the State of Michigan's own subdivisions expend public resources and how the Michigan Legislature preserves the "purity of elections."  Therefore, not only does government itself have no First Amendment protection, but there is also the common sense principle that government is permitted to restrain its own expression using means that would be plainly unconstitutional if it were attempting to regulate another entity's expression.  Again, according to Justice Stewart:

> "Government is not restrained by the First Amendment from controlling its own expression, cf. *New York Times Co. v. United States,* 403 U. S. 713, 728-729 (Stewart, J., concurring). As Professor Thomas Emerson has written, 'The purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents.' The System of Freedom of Expression 700 (1970)."

412 U.S. at 139 n.7 (Stewart, J., concurring).

Consequently, the Government may advance or restrict its own speech in a manner that would clearly be forbidden were it regulating the speech of a private citizen. *See, for example*, *Wooley v. Maynard*, 430 U.S. 705 (1977) (state may express official view of state history, but may not force individuals to do so). Accordingly, since Section 57(3) controls the expression of the State of Michigan's own agents when using public resources only, it cannot violate the First Amendment.

**III.  Using private resources, the Plaintiffs are not restricted -- in any manner whatsoever -- by Section 57(3).**

Using private resources, the Plaintiffs are not restricted -- in any manner whatsoever -- by Section 57(3). Plaintiffs, acting in their individual capacity, are completely unaffected by Section 57(3). Therefore, the Plaintiffs, in their individual capacity or using private resources, can suffer no harm absent the injunction. This case is that simple.

**IV.  The substantial harm to others if the injunction should be issued.**

There is no individual or group before this Court opposed to any particular local ballot question. However, any individual or group opposed to a particular local ballot question would be significantly harmed if the Plaintiffs' requested injunction were issued. Under the First Amendment, citizens with opposing views have the right to express these views free from government interference. Again, these principles were laid out in the 28 cases offered by the Plaintiffs herein which recognized the First Amendment rights of <u>private interests</u>, but not of government actors. However, if the Plaintiffs' requested injunction were issued, any public body or a person acting for a public body, could use public resources to disseminate so-called "objectively neutral information" in order to promote a local ballot question. Significantly, the government may not monopolize the "marketplace of ideas," thus drowning out private sources of speech. *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969).  Consequently, the legitimate First Amendment rights of private actors (who are not before this Court) would now be impaired if a public body, or a person acting for a public body, were allowed to interfere with the otherwise legitimate First Amendment rights of these private actors if government is allowed to use public resources in order to promote a local ballot question.

13

**V.  The public interest favors the ability of the State of Michigan to determine how the State of Michigan's own subdivisions expend public resources and how to preserve the purity of elections.**

It is a time-honored principle that the "judiciary cannot usurp the functions of the legislature in order to control that branch of the Government in exercising its lawful functions." *McCray v. United States,* 195 U.S. 27 (1904). In the present case, the Michigan Legislature exercised its lawful function to adopt Section 57(3).  As discussed earlier in this Brief, the Michigan Legislature's adoption of Section 57(3) represents a valid exercise of legislative authority to regulate the use of public resources and to "preserve the purity of elections" under the Michigan Constitution.  Significantly, the legislative review of Section 57(3) is ongoing, as there are at least five legislative bills aimed at either amending or even repealing Section 57(3).  *See* Senate Bills 703 and 721; House Bills 5219, 5221, and 5249.  Instead of engaging in the democratic process, the Plaintiffs here have skipped the channels of representative government to invoke the power of the judiciary.  In *Entertainment Productions, Inc. v. Shelby County, Tennessee*, 721 F.3d 729 (6th Cir. 2013), the Sixth Circuit commented on invoking the power of the judiciary to set aside a legislative policy:

> "None of this is to say that Virginia's policy is unassailable or even right. But the primary means to challenge legislative misconceptions is through the channels of representative government: hearings, speeches, conversations, debates, the whole clamorous drama of democracy that leads to the enactment of the given law. In the First Amendment context, those affected by restrictions designed to combat secondary effects may of course demonstrate that the justification for a particular restriction rests on 'shoddy data or reasoning.' But to invoke the power of the judiciary to set the policy aside, such evidence must be sufficiently convincing to 'prove[ ] unsound' the government's justification for its policy."

*Id.* at 738 n.2 (quoting *Imaginary Images, Inc. v. Evans,* 612 F.3d 736, 749 (4th Cir.2010)).

Rather than engage in the "whole clamorous drama of democracy", the Plaintiffs here are seeking a shortcut by demanding that this Court substitute its judgment for that of the Michigan Legislature, which is currently engaging in an ongoing review of Section 57(3).  However, even when the wisdom of judgment of the State legislature is debatable, a federal court is not free to set aside the legislature's judgment to substitute its own. *Kelley v. Metropolitan Bd. of Educ. of Nashville and Davidson Cty. Tenn.*, 836 F.2d 986, 996 (6th Cir.1987), cert. denied, 487 U.S. 1206 (1988).  Accordingly, the public interest favors the ability of the State of Michigan to determine how the State of Michigan's own subdivisions expend public resources and how to preserve the purity of elections.

## CONCLUSION AND RELIEF REQUESTED

For these foregoing reasons, *amicus curiae* Foundation for Michigan Freedom respectfully requests that this Court deny Plaintiffs' *Ex Parte* Motion for a Temporary Restraining Order and a Preliminary Injunction.

Respectfully submitted,

DOSTER LAW OFFICES, PLLC

*s/Eric Doster*
Eric Doster
Attorney for Foundation for
Michigan Freedom
2145 Commons Parkway
Okemos, MI 48864
Email: eric@ericdoster.com
(P41782)

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2016, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing of the foregoing document as well as via US Mail to all non-ECF participants.

*s/Eric Doster*
Eric Doster
2145 Commons Parkway
Okemos, MI 48864
Email: eric@ericdoster.com
(P41782)

16