UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT TAYLOR, Mayor, City of Roseville;
DOUGLAS R. ALEXANDER, City Manager,
City of Algonac; MATTHEW BIERLEIN,
County Commissioner, Tuscola County;
DONALD LYONS, Mayor, City of Dowagiac;
TODD R. ROBINSON, Superintendent, New Haven
Community Schools; RUSSELL                          No. 2:16-cv-10256
PICKELL, Superintendent, Riverview
Community Schools; KELLY COFFIN,
Superintendent, Tecumseh Public Schools;
KIMBERLY AMSTUTZ-WILD, School Board
President, Tecumseh Public Schools; KEITH
WUNDERLICH, Superintendent, Waterford               HON. JOHN CORBETT
School District; ROBERT SEETERLIN, School           O'MEARA
Board President, Waterford School District;
MICHELLE IMBRUNONE, Superintendent,                 MAG. R. STEVEN
Goodrich Area Schools; DAVID P. PRAY,               WHALEN
Superintendent, Clinton Community Schools;
PATRICIA MURPHY-ALDERMAN,
Superintendent, Bryon Area Schools; AMY
LAWRENCE, School Board President, Byron
Area Schools; AMY LAWRENCE, School
Board President, Byron Area Schools; ROBERT
D. LIVERNOIS, Superintendent, Warren
Consolidated School District; YVONNE
CAAMAL CANUL, Superintendent, Lansing
School District; in their individual and official
capacities; and STEPHEN PURCHASE, in his
individual capacity,

        Plaintiffs,

v

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

RUTH JOHNSON, in her official capacity as
Secretary of the State of Michigan; and the
STATE OF MICHIGAN,

        Defendants.
_____/

| | |
|---|---|
| Scott R. Eldridge (P66452) | Denise C. Barton (P41535) |
| Michael J. Hodge (P25146) | Joseph Y. Ho (P77390) |
| Attorneys for Plaintiffs | Assistant Attorneys General |
| Miller Canfield | Attorneys for Defendants |
| One Michigan Avenue, Ste. 900 | P.O. Box 30736 |
| Lansing, Michigan 48933 | Lansing, Michigan 48909 |
| 517-483-4918 | 517-373-6434 |
| Eldridge@millercanfield.com | bartond@michigan.gov |
| hodge@millercanfield.com | hoj@mi.gov |
| | |
| Jerome R. Watson (P27082) | Gary P. Gordon (P26290) |
| Brian M. Schwartz (P69018) | Jason T. Hanselman (P61813) |
| Attorneys for Plaintiffs | Dykema Gossett PLLC |
| Miller Canfield | Attorneys for Proposed *Amici Curiae* |
| 150 West Jefferson, Ste 2500 | 201 Townsend Street, Suite 900 |
| Detroit, Michigan 48226 | Lansing, MI 48933 |
| 313-963-6420 | (517) 374-9133 |
| Schwartzb@millercanfield.com | ggordon@dykema.com |
| watson@millercanfield.com | jhanselman@dykema.com |

_____/

## BRIEF OF THE MICHIGAN MUNICIPAL LEAGUE, THE MICHIGAN ASSOCIATION OF COUNTIES, THE MICHIGAN TOWNSHIPS ASSOCIATION AND THE CONFERENCE OF WESTERN WAYNE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

ii

# **TABLE OF CONTENTS**

**Page**

Table of Authorities ..................................................................................v

I.  Introduction..................................................................................1

    A.  Summary of the Dispute ......................................................1

    B.  Identity and Interest of *Amici Curiae* ...............................2

        1.  The Michigan Municipal League..............................2

        2.  The Michigan Association of Counties ....................4

        3.  The Michigan Townships Association .....................5

        4.  Conference of Western Wayne ..................................6

    C.  Source of Authority to File...................................................7

II.  Argument .....................................................................................7

    A.  Section 57(3) of PA 269.......................................................7

    B.  Section 57(3) Impermissibly Restrains Free Speech in Violation of the First Amendment of the United States Constitution .........................10

        1.  The First Amendment Prohibits Restraints on Political Speech.........................................................................10

        2.  Section 57(3) Restrains Discussions Regarding Political Speech and is Subject to Strict Scrutiny ..............................12

        3.  The State Lacks a Compelling Government Interest in Restraining Content Neutral Speech by Governments and Public Officials...................................................................12

        4.  Even If The State Had A Compelling Interest In Restraining Content Neutral Speech, Section 57(3) Is Not The Least Restrictive Means By Which The State Could Do So .............13

    C.  Section 57(3)'s Restraint On Speech Exceeds Constitutionally

iii

Permissible Boundaries ...............................................................................17

D.      PA 469 Violates The Equal Protection Clause ..................................18

E.      PA 469 Is Unconstitutional Vague Under The Due Process
Clause Of The United States Constitution.....................................................19

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v ACLU*,
542 US 656; 124 S Ct 2783; 159 L Ed 2d 690 (2004) ........................................16

*Baggett v. Bullitt*,
377 U.S. 360, 84 S. Ct. 1316, 12 L. Ed. 2d 377 (1964) ....................................21

*Buckley Const., Inc. v. Shawnee Civic & Cultural Development Authority*,
933 F.2d 853 (10th Cir. 1991) ..........................................................................18

*Citizens United v. FEC*,
558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 253 (2010) ........................1, 12, 18

*F.C.C. v. Fox TV Stations, Inc.*,
132 S. Ct. 2307, 183 L. Ed. 2d 234 (2012)........................................................20

*FEC v Mass Citizens for Life, Inc*,
479 US 238; 107 S Ct 616; 93 L Ed 2d 539 (1986) ..........................................14

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.*,
551 U.S. 449, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007) ................................12

*First Nat. Bank of Boston v. Bellotti*,
435 U.S. 765, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978) ....................................18

*Grayned v. City of Rockford*,
408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) ..............................19, 20

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982) ..................................20

*Holder v. Humanitarian Law Project*, *Holder v. Humanitarian Law Project*,
561 U.S. 1, 130 S. Ct. 2705 (2010)....................................................................11

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN  48933

*Kolender v. Lawson*,
461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) ...................................19

*Lovell v. City of Griffin*,
303 U.S. 444, 58 S. Ct. 666, 82 L. Ed. 949 (1938)...............................................11

*McCutcheon v. FEC*,
134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014), (Thomas, J. concurring) ...............10

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995) .................................10

*Meyer v. Grant*,
486 U.S. 414, 108 S. Ct. 1886 (1988)..................................................................12

*Morse v. Frederick*,
551 U.S. 393, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007) .................................11

*Papachristou v. City of Jacksonville*,
405 U.S. 156, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972) .......................................20

*Reno v ACLU*,
521 US; 117 S Ct 2329; 138 L Ed 2d 874 (1997) ..............................................16

*Republican Party v. White*,
416 F.3d 738 (8th Cir. 2005) ..............................................................................14

*Rutan v Republican Party of Ill*,
497 US 62; 110 S Ct 2729; 111 L Ed 2d 52 (1990) ...........................................14

*Stromberg* v. *California*,
283 U. S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 (1931)..........................................10

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353, 129 S. Ct. 1093, 172 L. Ed. 2d 770 (2009) .................................17

## CONSTITUTIONAL PROVISIONS

Mich Const 1963, art VII ................................................................................12, 17

United States Constitution ....................................................................1, 2, 18, 19

First Amendment of the United States Constitution.........................................passim

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900·LANSING, MICHIGAN 48933

Fourteenth Amendment of the United States Constitution...........................10, 18, 19

**STATUTES**

MCL 169.257(1) .....................................................................................9, 21

MCL 169.257(3) .........................................................................................passim

Michigan Campaign Finance Act, 1976 PA 388, MCL 169.201 et seq...........passim

**OTHER AUTHORITIES**

Emily Lawler, *Clarify? Repeal? Michigan legislature looks at follow-*
   *up options for 'gag order' bill*,
   http://www.mlive.com/news/index.ssf/2016/01/clarify_repeal...........................16

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN  48933

# I.      Introduction

*Because speech is an essential mechanism of democracy--it is the means to hold officials accountable to the people--political speech must prevail against laws that would suppress it by design or inadvertence.*

--*Citizens United v. FEC*, 558 U.S. 310, 312, 130 S. Ct. 876, 175 L. Ed. 2d. 253 (2010)

## A.      Summary of the Dispute

Michigan's legislature added an amendment to a campaign finance bill to prevent local public officials from using public resources to communicate regarding local ballot measures within 60 days of an election.  2015 PA 269 ("PA 269").  The problem is that the new prohibition appears to have been hastily prepared and not properly reviewed to determine whether the legislation's restraint on free speech passes constitutional muster.  Section 57(3) of PA 269 clearly violates the United States Constitution.  The Legislature has no compelling interest in restraining content neutral speech and Section 57(3) is not narrowly tailored to achieve any legitimate government interest.  Section 57(3) must, therefore, be declared unconstitutional and enforcement of the provision enjoined.

It appears, although it is still unclear, that public officials, including all of the *amici's* members, are restrained from discussing—verbally, in writing, or electronically—through mass communications any ballot measure within 60 days of the election, if the communication would involve the expenditure of public funds.  Unfortunately, Section 57(3) is so poorly written that public officials do not

1

know, for example, if they can respond to a question from the public regarding a pending ballot proposal at a televised public meeting.  If the public official is being paid to attend the meeting or if the meeting space or equipment are paid for by public funds, arguably "public funds" are being used for a "person acting for a public body" to engage in "communication" by "television."  *Amici* recognizes that the Legislature probably did not intend such a restraint, however, hasty drafting leaves it an open question.  Where such an open question could result in criminal charges for public officials violating the new law, such ambiguity creates a chilling effect restraining political speech and violates the United States Constitution.

**B.**     **Identity and Interest of** *Amici Curiae*

**1.**     **The Michigan Municipal League**

The  Michigan  Municipal  League  ("MML")  is  non-profit  Michigan corporation comprised of 521 Michigan local cities and villages.  It provides educational services to its members, advocates at the state and federal level for, or in opposition, to legislation that impacts its members, and intervenes in litigation in both state and federal courts to present the position of its members on issues that may interfere with the fair and efficient governing of its member governmental units.

MML members conduct numerous elections at which issues may be placed before the electorate that directly impact the operations, functions, and territory of

2

its members.  Many of these issues are complex and require government units and/or elected officials to explain them in a factual, non-partisan, and unbiased manner so that the electorate may be fully informed of the issues prior to Election Day.  *See* Exhibit A, MML Executive Director Daniel P. Gilmartin's Declaration. Examples of the type of factual information provided to voters are included as attachments to the Kalamazoo Deputy City Clerk's Declaration.  Exhibit B.  The electorate, based on information and belief, does not focus on ballot issues until the time period encompassed by a 60-day window before the election.  Exhibit A, ¶4.

MML's interest in this matter is to ensure that public officials are free to speak to voters regarding pending ballot proposals, and are not restrained from informing voters out of a fear of criminal prosecution in the event they undertake such political speech.  *Id.*

MML's interest is also to ensure voters, who are constituents of its members, are able to be informed of critical ballot question issues in the time immediately before an election, so that a reasonable and informed decision may be made by the citizens of each of MML's member cities, villages and townships.  Examples of the types of issues that may be considered include, but are not limited to, charter amendments, whether or not to adopt ordinances or zoning regulations, annexations of territory from one governmental unit to another, whether to incorporate as a city or not, consolidation of police and fire services with another

3

governmental unit, etc.  These issues are complex and local units of government and their elected officials are best situated to explain—on a factual and non-partisan basis—the complexities of the issues.

Absent this ability to explain the issues, an uninformed electorate may vote on issues and suffer unintended consequences that would not be present had the voters been provided adequate information by the individual units of government and/or their elected officials.  If local governments are unable to disseminate factual information about election issues, many voters who rely on local governments to provide factual information about upcoming proposals likely will simply not vote at all on these ballot proposals.

MML's interests are more broad, diverse, and unique than the Plaintiffs and, therefore, the MML brings a unique perspective which should justify its participation as *amicus*.

### 2.    The Michigan Association of Counties

The Michigan Association of Counties (the "Counties") is a nonpartisan, non-profit organization that advances education, communication, and cooperation among county government officials in Michigan, and is the counties' voice at the state and federal level, providing legislative support on key issues affecting its members.  *See* Exhibit C, Declaration of Timothy McGuire.  Counties often place complex issues on the ballot, including whether certain programs should be

4

funded, millage renewals, annexation issues, and other complex issues that require neutral, factual, and non-biased information to be provided to the voters. *Id*. Similar to municipal officials, to deny county elected officials the opportunity to communicate factual information with voters within a 60-day time period prior to the election will have the same adverse impacts as detailed above for municipalities. The Counties have a unique perspective that should justify its participation as *amicus* in this matter.

### 3. The Michigan Townships Association.

The Michigan Townships Association (the "Townships") is a non-profit corporation that represents the interests of 1,240 local units of government that govern over 96% of Michigan's land area, and provides educational services, publications, educational workshops, and online learning opportunities to its members, as well as advocating on their behalf with regard to legislative issues. *See* Exhibit D, Declaration of G. Lawrence Merrill.

Many of the issues appearing on township election ballots are complex and require explanation—particularly during the 60 days prior to an election—when voters are more likely to focus on the issues, through mass communications such as cable television, broadcast of township board meetings, and distribution of factual information through the mail. *Id*. However, Section 57(3) of PA 269 prohibits this communication and, in fact, makes certain communications criminal.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

Township's members are concerned that the vague nature of the Act may inadvertently cause them to violate the law, leading to possible criminal charges. Township's interests are similar to those of the MML and the Counties in that it conducts elections, has an interest in informing the electorate, and desires to protect public officials' First Amendment rights.

### 4. Conference of Western Wayne.

The Conference of Western Wayne ("CWW") is a consortium of 18 western Wayne County communities consisting of the Cities of Belleville, Dearborn, Dearborn Heights, Garden City, Inkster, Livonia, Northville, Plymouth, Romulus, Wayne and Westland, and the Townships of Canton, Huron, Northville, Plymouth, Redford, Sumpter and Van Buren. Among other functions, CWW monitors state and federal legislation for impacts on local government.   *See* Exhibit E, Declaration of Jordyn Salmon.   The cities and townships that are members of CWW are adversely impacted by Section 57(3) of PA 269 in many of the same ways as are members of the other *Amici*.   Section 57(3) will have the impact of reducing the available information to voters on issues that can be very complex, and upon which information may not be available from any reliable sources other than government.   *Id*.   Ballot wording can be quite complex due to legal requirements for millages and other issues.  See, Exhibit E, ¶ 4.  Absent the ability to provide explanatory information to the voters, voters will likely either be

6

confused or will not understand the issue. CWW interests are different and, as with the other *amici*, unique from the Plaintiffs.

## C.   Source of Authority to File

The Parties to this matter have agreed by stipulation to the filing of the Proposed Amici Curiae Brief. Therefore, by separate motion and based on the Stipulation of the Parties, under the inherent authority of the federal district court, the Amici have filed a Motion seeking leave to file the brief.

## II.   ARGUMENT

## A.   Section 57(3) of PA 269.

On December 16, 2015, the Legislature passed SB 571 of 2015 ("SB 571"), which was given immediate effect. SB 571 proposed to add a new subsection (3) to Section 57 of the Michigan Campaign Finance Act, 1976 PA 388, MCL 169.201 et seq. (the "Act"), which provided:

> Except for an election official in the performance of his or her duties under the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992, a public body, or a person acting for a public body, shall not, during the period 60 days before an election in which a local ballot question appears on a ballot, use public funds or resources for a communication by means of radio, television, mass mailing, or prerecorded telephone message if that communication references a local ballot question and is targeted to the relevant electorate where the local ballot question appears on the ballot.

MCL 169.257(3).

Governor Snyder signed SB 571 into law as PA 269 on January 6, 2016, but

7

expressed concerns regarding the ambiguities in Section 57(3) and called on the Legislature to enact new legislation to fix the concerns that are the subject of this case.[1]  Specifically, Governor Snyder's letter stated:

> Recognizing that many local governmental entities and schools have raised concerns regarding confusion with the new language in section 57, I am calling on the Legislature to enact new legislation to address those concerns, and clarify that the new language does not impact the expression of personal views by a public official, the use of resources or facilities in the ordinary course of business, and that it is intended only to prohibit the use of targeted advertisement style mass communications that are reasonably interpreted as an attempt to influence the electorate using taxpayer dollars. Local governmental entities and schools should still be allowed to distribute basic information about an election including the proposed or final ballot language and the date of the election.

Section 57(3) of PA 269 prohibits communication of factual, unbiased, non-partisan information by the governmental unit, elected officials, employees, volunteers, or anyone else "acting for a public body" about any issues that may appear on the ballot for a period of 60 days before the election utilizing public funds in mass communications.  Unfortunately, "person acting for a public body" is an undefined phrase, leaving the applicability of Section 57(3)'s criminal sanctions even more troubling.  Is the prohibition limited to elected officials or

---

[1] Because PA 269 took effect 62 days before the March 8, 2016 election, government entities with March elections had just 2 days to communicate with constituents before the 60-day gag order took effect.  Many governments already had proposals on the March ballot that could not be removed at the time Governor Snyder signed the legislation—leaving public bodies and public officials unable to provide information to citizens regarding pending ballot questions.

8

those employed by the public body?  Is a school district's PTA acting for the

public body?  Students within a school district?  The Legislature did not clarify the

prohibition's applicability, so it is anyone's guess.

Although the State asserts that Section 57(3)'s purpose is "to prohibit

communications that are plain attempts to influence voters to vote in a particular

way without using words like "vote for" or "support,"[2] the Act already prohibited

such activity, stating that:

> A public body or a person acting for a public body shall not use or
> authorize the use of funds, personnel, office space, computer hardware
> or software, property, stationery, postage, vehicles, equipment,
> supplies, or other public resources to make a contribution or
> expenditure or provide volunteer personal services that are excluded
> from the definition of contribution under section 4(3)(a). The
> prohibition under this subsection includes, but is not limited to, using
> or authorizing the use of public resources to establish or administer a
> payroll deduction plan to directly or indirectly collect or deliver a
> contribution to, or make an expenditure for, a committee. Advance
> payment or reimbursement to a public body does not cure a use of
> public resources otherwise prohibited by this subsection.

MCL 169.257(1)

Contribution as used in this section is defined in section 4(1) of the Act as

"…for the purpose of influencing the nomination or election of a candidate, for the

qualification, passage, or defeat of a ballot question, or for the qualification of a

new political party."   MCL. 169.204(1).   So the "communications" that are

---

[2]  State's Brief, *Id*. at 4.

9

allegedly subject of the new section 57(3) are *already* prohibited.   Thus, the communication that is banned by the new section is a limitation on the ability to inform the electorate in a factual, non-partisan, unbiased manner of complex issues that are pending on the ballot in the 60 days before the election.   This limitation applies if the speaker is a public body or a person acting for the public body, both of which are in the best position to provide factual information and explanations to voters.   That is particularly true given that the public officials seeking to explain a ballot question often are those who decided to offer a ballot question to voters.

**B.     Section 57(3) Impermissibly Restrains Free Speech in Violation of the First Amendment of the United States Constitution.**

   **1.     The First Amendment Prohibits Restraints on Political Speech.**

The First Amendment of the United States Constitution provides that Congress "shall make no law . . . abridging the freedom of speech."   The Fourteenth Amendment makes that prohibition applicable to the States.   *Stromberg* v. *California*, 283 U. S. 359, 368, 51 S. Ct. 532, 75 L. Ed. 1117 (1931).

   The regulation of political speech or expression is, and always has been, at the core of the protection afforded by the First Amendment.   *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995). "Political speech is the primary object of First Amendment protection and the lifeblood of a self-governing people."   *McCutcheon v. FEC*, 134 S. Ct. 1434, 1462, 188 L. Ed. 2d 468 (2014), (Thomas, J. concurring) (internal quotations omitted).   It

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN  48933

is at the heart of the protections of the First Amendment and is, "of course…at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007) (internal quotation omitted).

The Supreme Court has also recently explained that "speech and association for political purposes is the kind of activity to which the First Amendment ordinarily offers its strongest protection . . . ." *Holder v. Humanitarian Law Project*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 42, 130 S. Ct. 2705 (2010) (citing, *NY Times Co. v. Sullivan*, 376 U.S. 254, 259, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (the Founding Fathers fashioned the First Amendment "'to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'") (quoting *Roth v. US*, 354 U.S. 476, 484, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957))) (emphasis omitted).  The Supreme Court has gone so far as to declare that instruments articulating or disseminating ideas and opinions in the political arena are "weapons in the defense of liberty." *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S. Ct. 666, 82 L. Ed. 949 (1938) (rejecting licensing scheme for pamphlets and leaflets).  *Amici's* members regularly use these weapons in the defense of liberty to educate citizens regarding upcoming ballot measures.  *See* examples of informational material attached as Exhibits F-L.

"The right of citizens to inquire, to hear, to speak, and to use information to

11

reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United, supra at* 339. First Amendment standards "must give the benefit of any doubt to protecting rather than stifling speech." *Federal Election Comm'n v. Wisconsin Right to Life, Inc*., 551 U.S. 449, 469, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007).

> **2.    Section 57(3) Restrains Discussions Regarding Political Speech and is Subject to Strict Scrutiny.**

Discussion of ballot proposals—no matter who the speaker—is political speech. *See, e.g., Meyer v. Grant*, 486 U.S. 414, 108 S. Ct. 1886 (1988). Laws that burden political speech are "subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United* at *supra*, at 339 (quoting *Wisconsin Right to Life*, *supra*, at 464).[3]

> **3.    The State Lacks a Compelling Government Interest in Restraining Content Neutral Speech by Governments and Public Officials.**

The State's asserted purpose of Section 57(3) is "to prohibit communications that are plain attempts to influence voters to vote in a particular way without using

---

[3] The State asserts that the standard of review is less exacting based on the speaker's character. The State properly notes that some Plaintiffs in the original Complaint derive their power from the State, however, the State fails to acknowledge that counties and townships created by the Michigan Constitution have certain powers also designated by the constitution and that the State has no power to diminish those governments' sovereign power. Mich Const 1963, art VII.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN  48933

words like 'vote for' or 'support.'" State's Brief, at 4. The State, therefore, appears to be arguing that Section 57(3)'s prohibition is intended to prevent local governments from undertaking "express advocacy" without using the so-called "magic words" that expressly advocate for passage.

The State's asserted interest is odd though because the Act already prohibits express advocacy in this context. It also remains a mystery why the Legislature decided to subject public officials to criminal prosecution—especially since use of public funds for partisan purposes is already prohibited by the Act. Simply put, Section 57(3) is inexplicable because it appears the State is arguing the Legislature had a compelling interest in prohibiting conduct that was already prohibited.

Given that there is no other rational explanation for this new prohibition and that the language of Section 57(3) was passed without a hearing or even open legislative discussion, and that this Court cannot accept theoretical or post-hoc explanations for the Legislature's reasoning, *amici* seems to be left with no choice but to accept the explanation in Defendants' Brief. The problem is that the Legislature went far beyond its stated intent in enacting Section 57(3).

**4. Even If The State Had A Compelling Interest In Restraining Content Neutral Speech, Section 57(3) Is Not The Least Restrictive Means By Which The State Could Do So.**

PA 269 must be narrowly tailored to further a compelling government interest. A law is narrowly tailored if it is the least restrictive means by which the

state could advance its interest. *See*, e.g., *Rutan v Republican Party of Ill*, 497 US 62, 74; 110 S Ct 2729; 111 L Ed 2d 52 (1990); *FEC v Mass Citizens for Life, Inc*, 479 US 238, 262; 107 S Ct 616; 93 L Ed 2d 539 (1986).  Furthermore,

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)."

*Republican Party v. White*, 416 F.3d 738, 751 (8th Cir. 2005)

In seeking to prohibit governments and public employees from advocating for or against ballot questions, the Legislature used a sledgehammer to crack a nut—a nut that had already been cracked.  As noted above, the Legislature sought to solve a perceived problem by prohibiting conduct that the Act already prohibits.  However, instead of merely strengthening the prohibition on public bodies or officials conducting direct advocacy with public dollars, the Legislature drastically expanded the prohibition to forbid public bodies from using public funds to inform voters with unbiased, nonpartisan information, such as the language of a specific ballot measure, within 60 days of a relevant election.   Indeed, Section 57(3) precludes public bodies and officials from even referencing the existence of a ballot proposal, let alone informing citizens regarding the ballot question proposed by the public body.

Moreover, Section 57(3) left in doubt whether a public officer could opine on a ballot question if directly asked on a radio interview or if a public body could send out a mailing to constituents notifying them of the issues to be on the ballot on Election Day.  Such communications are all essential to democratic processes and an informed electorate, not to mention core political speech that the electorate has a constitutional right to receive. In seeking to rectify an insignificant, if not imagined, problem, the Legislature created a host of very real, and very serious, issues, including the threat of criminal prosecution to suppress and silence constitutionally-protected speech.

Less than two weeks after PA 269 went into effect, HB 5219 of 2016 was introduced to amend Section 57(3) to allow a public body, or a person acting on behalf of a public body, to use public funds to communicate the language of a local ballot question or the date of an election to the electorate within 60 days of an election.  Similarly, the bill allows a public body to discuss a local ballot initiative at a meeting of a public body, so long as both proponents and opponents of the measure have an equal opportunity to discuss.  In short, HB 5219 seeks to rectify the constitutional injuries rendered by PA 269.

As Representative Lyons explained in introducing the new bill, "[t]he bill will clarify that officials can indeed discuss ballot question at their meetings.  It also expressly allows the election date and ballot language to be included in

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900·LANSING, MICHIGAN 48933

publicly funded mass communication."  Emily Lawler, *Clarify? Repeal? Michigan legislature looks at follow-up options for 'gag order' bill*, MLIVE, (January 15, 2016, 12:21 PM), http://www.mlive.com/news/index.ssf/2016/01/clarify_repeal_michigan_legisl.html.   Representative Lyons went on to say, "Let's make no mistake that local officials are indeed able to do their public duty by providing factual information to residents about ballot questions, but they will not be permitted to cross the line from informing citizens into influencing voters at the expense of the taxpayer." *Id*.

More importantly, however, this legislation, and the rapidity with which it was drafted and introduced, unequivocally demonstrates that the Legislature could have easily chosen another, less restrictive, alternative to address the purpose behind the amendment to Section 57(3).  When regulating protected speech, the government must restrict speech no more than necessary to achieve its goals. *Ashcroft v ACLU*, 542 US 656, 666; 124 S Ct 2783; 159 L Ed 2d 690 (2004).  If a less restrictive alternative would effectively serve the State's purpose, then the burden on speech is unacceptable.  *Reno v ACLU*, 521 US, 844, 874; 117 S Ct 2329; 138 L Ed 2d 874 (1997).  Here, the Legislature itself has shown that a less restrictive alternative existed, and by passing PA 269 instead chilled legitimate and protected speech to an unacceptable degree.  As such, PA 269 runs afoul of

16

constitutional standards, and the State should be enjoined from enforcing Section 57(3) as amended.

### C.     Section 57(3)'s Restraint On Speech Exceeds Constitutionally Permissible Boundaries.

The State argues that Section 57(3) is constitutional because governmental bodies receive their powers from the state and may be destroyed by the Legislature and, therefore, the Legislature may impose any regulation it desires, including a complete ban on speech, if public funds are expended.  Defendants' Brief, at pp 5-6.  Of course, that argument ignores that the Michigan Constitution created counties and other municipalities, and specifically provides for certain officers to serve as public officials.  Mich Const 1963, art VII.

One case the State cites in support of Section 57(3)'s restraint on speech is *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 129 S. Ct. 1093, 172 L. Ed. 2d 770 (2009), in which the court considered whether an Idaho law banning payroll check-offs for political purposes was constitutional.  The Court allowed the law, but noted that "Idaho's law does not restrict political speech, but rather declines to promote that speech by allowing public employee checkoffs for political activities."  *Id*. at 355.

Of course, that fact situation is completely different from the instant case where the statute expressly restricts political speech based both on its content and on the speaker's identity.

17

### D.     PA 469 Violates The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution states:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.  US Const., Amendment XIV.

In short, the Equal Protection Clause prohibits the government from denying equal protection of the laws to any person.  US Const, amend XIV.  The Equal Protection Clause is triggered when the government treats someone differently than another who is similarly situated.  *Buckley Const., Inc. v. Shawnee Civic & Cultural Development Authority*, 933 F.2d 853, 859 (10th Cir. 1991).  Specifically in the context of protected speech, the First and Fourteenth Amendments operate to prohibit restrictions distinguishing among different speakers, allowing speech by some but not others.  *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 784, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978).

The Supreme Court explained in *Citizens United* that "[a]s instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content."  *Citizens United v. FEC*, 558 U.S. 310, 340.  In this case, the Michigan Legislature seeks to treat public officials, public employees, public body volunteers, or anyone else deemed

18

to be "acting for a public body" different than others who are similarly situated. For example, at a city council meeting, a part-time city council member would be barred from discussing an impending charter amendment, while his or her next door neighbor would have no similar restriction. Such disparate treatment among similarly situated individuals violates the Equal Protection Clause.

### E.   PA 469 Is Unconstitutional Vague Under The Due Process Clause Of The United States Constitution.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution states:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.  US Const., Amendment XIV.

Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).  Statutory limitations on those freedoms are examined for substantive authority and content as well as for definiteness or certainty of expression. *Id*.

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972).  The void-for-vagueness doctrine requires that a statute imposing criminal penalties define the criminal

19

offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). An act is unconstitutionally vague if it does not provide: (1) fair warning of the prohibited conduct and (2) guidance to avoid arbitrary enforcement. *F.C.C. v. Fox TV Stations, Inc.*, 132 S. Ct. 2307, 2317, 183 L. Ed. 2d 234 (2012).

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972). Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. *Id.* A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Grayned*, *supra*, at 408 U.S. 104, 108-09, 92 S. Ct. 2294, 2298-99 (1972). Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those]

20

freedoms." *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S. Ct. 1316, 12 L. Ed. 2d 377 (1964).   Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Id*. (*quoting Speiser v. Randall*, 357 U.S. 513, 526, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958)).

Here, it could be said that more is vague about Section 57(3) than is clear.  It is unclear who is "acting for a public body," what constitutes a "use of public…resources," whether public bodies may broadcast meetings via television or radio if any attendee at the meeting discusses an impending ballot question (i.e., does that broadcast constitute a "communication" by the public body that "references" a ballot question?).

Furthermore, Section 57(1)(a)  of the Act excludes "expression of views by an elected or appointed public official who has policy making responsibilities" from the prohibition against use of public funds for political expression.  MCL 169.257(1)(a).  However, under the newly enacted Section 57(3) such expression of views is now prohibited if it uses public resources "for a communication by means of radio or television…."  Does this mean that the elected official—or other public official—in responding to a reporter's inquiry, may not use his public office or telephone without fear of prosecution—or not?  The plain language of the statute would appear so but the result would be absurd.  Would an elected official

21

or public employee be willing to risk it?

The Governor recognized the "confusion with the new language" before signing PA 269 and implored the Legislature to fix it. The Legislature now appears to recognize the error in its ways and is considering legislation to correct the ambiguities. Michigan citizens—and *amici curiae*, specifically—deserve clarity in laws that carry criminal penalties. Section 57(3) is far too vague to provide such certainty—it should be declared unconstitutional and its enforcement enjoined.

Dated: February 2, 2016

   */s/ Jason T. Hanselman*
Gary P. Gordon (P26290)
Jason T. Hanselman (P61813)
Dykema Gossett PLLC
Attorneys for Proposed Amicus Curiae
201 Townsend Street, Suite 900
Lansing, MI 48933
(517) 374-9133
ggordon@dykema.com
jhanselman@dykema.com

CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2016, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system which will send

notification of such filing to counsel of record.  I hereby certify that I have mailed

by United States Postal Service the same to any non-ECF participants.


Dated:  February 2, 2016              /s/ Jason T. Hanselman
                                      Jason T. Hanselman (P61813)
                                      Dykema Gossett PLLC
                                      Attorney for Proposed Amicus Curiae
                                      201 Townsend Street, Suite 900
                                      Lansing, MI 48933
                                      (517) 374-9181
                                      jhanselman@dykema.com